***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Ledford and defendant's brief and argument. The appealing party has not shown good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the Opinion and Award.
 ***********
The Full Commission finds as a fact and concludes as matters of law the following, which were entered into by parties as:
 STIPULATIONS
1. The parties are subject to and bound by the North Carolina Workers' Compensation Act.
2. The employee-employer relationship existed between the plaintiff and the defendant-employer on March 22, 2001.
3. The employer is insured with Zurich North America, which was on the risk at the time of the plaintiff's accident.
4. The date of plaintiff's injury by accident is March 22, 2001.
5. The parties agreed to stipulate to the following documents:
a. IC Form 18;
b. IC Form 19;
 c. Medical records which were marked as Stipulated Exhibit 1.
6. Subsequent to the hearing, additional medical records were received.
 ***********
Based upon all the competent evidence from the record, the Full Commission finds as follows:
 FINDINGS OF FACT
1. Plaintiff started working for the defendant employer in 1984. He operated heavy equipment, such as a truckhoe. On the date of the accident, March 22, 2001, his manager had asked plaintiff to bring a pack of absorbent pads down to the creek where he was working. As plaintiff was walking on the damp ground, he slipped and fell, landing on his back.
2. Plaintiff reported the accident to his supervisor. The next day plaintiff was examined at Moses Cone Occupational Health. He complained of back pain and general soreness, and pain in his right wrist, which had previously been fractured. He was assessed with mechanical back pain and a right wrist contusion. He was given a wrist immobilizer to use for a week and prescription medicines for pain.
3. At follow-up on March 30, 2001, plaintiff reported improvement in his right wrist and some improvement in his right shoulder pain, but worsening of pain in his low back and right hip. He was continued on work restrictions of maximum lifting, pushing or pulling of 25 pounds, and limited spinal maneuvers, minimum work using his right hand.
4. Plaintiff continued in follow-up at Moses Cone Occupational Health until September 19, 2001. During these visits, he continued to complain of neck pain, radiating into his shoulder. On May 17, 2001, he was referred to a neurosurgeon, Dr. Kyle Cabbell. At his last visit on September 19, plaintiff was released to continue follow-up with his personal physician or treating specialist.
5. Plaintiff was first examined by Dr. Cabbell on May 23, 2001. Plaintiff took the MRI with him for this visit. Plaintiff complained of pain in his left back, hip and lower extremity. Dr. Cabbell found the neurological exam to be normal. After reviewing the MRI, Dr. Cabbell concluded that plaintiff had a displaced disc at L5-S1 on the left, causing pressure and mild displacement on the S1 nerve root. Dr. Cabbell did not believe surgery was needed and plaintiff had no interest in surgery at that time. He recommended continued conservative treatment, and plaintiff participated in physical therapy. If something more was needed in the future, Dr. Cabbell suggested possible epidural steroid injections.
6. Plaintiff returned to see Dr. Cabbell on July 3, 2001 with complaints of left lower extremity pain and now some right lower extremity pain. Dr. Cabbell kept plaintiff on conservative treatment. Plaintiff saw Dr. Cabbell again on August 20. At that time, he reported his left leg was better, but still complained of his right leg. He complained of right shoulder pain. Dr. Cabbell could not determine the cause of plaintiff's right-sided pain, which was not apparent on the MRI.
7. Dr. Cabbell is of the opinion that plaintiff's fall of March 22, 2001 caused his lower back symptoms, including the left leg radiculopathy. He could not determine that the disk herniation or right-sided symptoms were related to the fall.
8. During this time, plaintiff continued to work for the defendant-employer, even though on modified duty. Plaintiff was laid off from work in November 2001, and the employer ceased operations about six months later.
9. On January 3, 2002, plaintiff was seen by Dr. Robert W. Irwin, Assistant Professor of Physical Medicine and Rehabilitation at Baptist Medical Center in Winston-Salem. Plaintiff complained of continued back pain, worsened by bending, standing, lifting, walking and driving. Dr. Irwin assessed plaintiff with fibromyalgia. In addition, he noted plaintiff's high blood pressure, possible diabetes, and family history of coronary artery disease in plaintiff's 50-year old brother. Dr. Irwin wanted a cardiac assessment and stress test for clearance before prescribing a treatment plan for plaintiff's fibromyalgia.
10. Plaintiff underwent a stress test on February 2, 2002, which was positive for ischemia. After receiving that report on March 7, Dr. Irwin noted that with those test results, plaintiff could not participate in an exercise program. He noted that plaintiff needed to be evaluated by a cardiologist "in his insurance group." Once cleared by the cardiologist, and assessed for any restrictions for physical therapy, he could return to Dr. Irwin for treatment.
11. On May 24, 2002, plaintiff was examined by Dr. Philip J. Nahser, a cardiologist. He noted plaintiff's history of hypertension, diabetes, and hypercholesterolemia. Dr. Nahser found that plaintiff had a dangerous narrowing of the right coronary artery. Plaintiff underwent angioplasty to open the artery and place a stent on May 29, 2002.
12. Dr. Nahser saw plaintiff in follow-up on June 7, 2002, at which time plaintiff was stable and doing well. From a cardiac standpoint, Dr. Nahser determined that plaintiff could return to work. Dr. Nahser anticipated plaintiff would see him again in September, but plaintiff did not show up.
13. Following his cardiac treatment, plaintiff returned to see Dr. Irwin on October 8, 2002. Dr. Irwin's assessment remained fibromyalgia. He also noted plaintiff's coronary artery disease, which was stable at the time. He referred plaintiff for physical therapy with no restrictions, but noted they should monitor for any symptoms of coronary artery disease.
14. Plaintiff participated in physical therapy, followed by a functional capacity evaluation (FCE) on January 16, 2003. The evaluation criteria showed no indications of symptom or disability exaggeration, for valid results. The results indicated that plaintiff could perform work in the sedentary demand level. Staff assessed a one percent whole body impairment based upon the range of motion of plaintiff's lumbar spine.
15. Plaintiff returned to Dr. Irwin on February 18, 2003, at which time Dr. Irwin reviewed the FCE results. Plaintiff complained of pain all over. Dr. Irwin assessed him with a four percent impairment to his low back under the North Carolina rating guide. He released plaintiff to return to sedentary work per the FCE results. He also indicated in his notes that plaintiff should find a primary care physician for continuing treatment as needed.
16. Dr. Irwin saw plaintiff again in April and in June 2003. In April, he ordered an MRI. At plaintiff's June 17 visit, Dr. Irwin reviewed the MRI report, which showed multiple level spondylosis with no evidence of any canal or foraminal stenosis. As Dr. Irwin testified, this MRI was essentially normal. There was no disk herniation problem. Dr. Irwin again released plaintiff from his care, to follow-up with his primary care physician as needed.
17. Dr. Irwin testified to his opinion that plaintiff's fibromyalgia was triggered by his fall of March 22, 2001. He anticipates plaintiff will continue to have chronic pain, and does not believe he could return to work operating heavy equipment. He does believe plaintiff can perform sedentary employment.
18. Dr. Irwin wrote plaintiff out of work on or about January 3, 2002, pending cardiac evaluation. At this time, plaintiff was also under restrictions due to his fibromyalgia. Plaintiff continued to be out of work under physician's restrictions or orders until he was released and rated by Dr. Irwin on February 18, 2003. At that time, plaintiff was released to return to sedentary work.
19. Prior to being taken out of work by Dr. Irwin in January 2002, plaintiff had been out of work due to being laid off and the closing of the defendant-employer's business. From January 3, 2002 through February 18, 2003, per Dr. Irwin's instructions, plaintiff was not released to return to work. His fibromyalgia, combined with his cardiac treatment, rendered him unable to engage in the duties of his prior employment, operating heavy equipment.
20. After participating in physical therapy, and the functional capacity evaluation, plaintiff was assessed as capable of returning to sedentary employment. However, as plaintiff testified, he has been unable to find employment that is suitable, given his age, education, experience, and current restrictions.
21. The parties did not enter any stipulations regarding plaintiff's wages. Plaintiff testified that he was paid a salary of $735.00 per week while in the employment of Four Seasons Environmental. The Form 18 likewise reflects that wage. Without further wage information, this generates an average weekly wage of $735.00.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. On March 22, 2001, plaintiff sustained an injury by accident arising out of and in the course of his employment with the defendant-employer Four Seasons Environmental, sustaining injury to his back, and triggering the onset of fibromyalgia. N.C. Gen. Stat. § 97-2(6).
2. As a consequence of his injury by accident, plaintiff has incurred medical expenses for treatment of his lower back and fibromyalgia. Defendants are responsible for payment for all such reasonably necessary medical treatment. Defendants are not responsible for payment for treatment of plaintiff's cardiac condition, which is unrelated to the injury by accident. N.C. Gen. Stat. §§ 97-2(19), 97-25.
3. As a consequence of his injury by accident, plaintiff has been unable to return to his prior employment operating heavy equipment. He has been unable to earn wages in the same or other employment and has been totally disabled from January 3, 2002 and continuing at least through February 18, 2003. N.C. Gen. Stat. §97-29.
4. Plaintiff's testimony shows that he has made efforts but has been unable to find suitable employment since being released by Dr. Irwin February 18, 2003. Plaintiff is entitled to the presumption of ongoing disability and is entitled to receive ongoing benefits, until such time as he returns to work or until further order of the Commission. See Tucker v. Lowdermilk,233 N.C. 185 (1951).
5. Plaintiff's average weekly wage of $735 yields a compensation rate of $490.02. N.C. Gen. Stat. § 97-2.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendants shall pay all expenses incurred for reasonably necessary medical treatment of plaintiff's back injury and fibromyalgia.
2. Defendants shall pay plaintiff compensation at the rate of $490.02 per week beginning January 2, 2002 and continuing until further order of the Commission. All amounts accrued to date are to be paid in a lump sum.
3. A reasonable attorney's fee of twenty-five percent of the compensation awarded to plaintiff is approved for his counsel of record. Twenty-five percent of the lump sum due plaintiff shall be paid to his counsel and thereafter every fourth check due shall be paid to counsel.
4. Defendant shall pay the costs, including the following expert witness fees: $325 to Dr. Nahser (previously approved), $250 to Dr. Cabbell, and $270 to Dr. Irwin.
This the 20th day of August 2004.
 S/_______________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
 S/_____________ THOMAS J. BOLCH COMMISSIONER
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
DCS/mlb